UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DECATUR VENTURES, LLC, an Indiana Limited Liability Company; and TRENT D. DECATUR, an Individual, ) ) ) ) | |
| Plaintiffs, ) ) | |
| TRIAGE REALTY INVESTMENT, INC., an Indiana Corporation; JAMIE K. GOETZ, an Individual; TONYA S. (BLYTHE) HARVEY, an Individual; and MONA ORKOULAS, an Individual, ) ) ) ) ) ) ) | 1:04-cv-0562-JDT-WTL |
| Intervenor Plaintiffs, ) ) | |
| vs. ) ) | |
| STAPLETON VENTURES, INC., an Indiana Corporation; NOVASTAR HOME MORTGAGE, INC., a Delaware Corporation; MICHAEL W. STAPLETON, an Individual; COURTENAY STOCKER, an Individual; MICHAEL L. JOHNSON, an Individual; LISA F. PHILLIPS, an Individual; and KIMBERLY DANIEL, an Individual, ) ) ) ) ) ) ) ) ) | |
| Defendants. ) | |

**ENTRY ON DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

**OR TO STAY PENDING JOINDER OF NECESSARY PARTIES (Docket No. 188)**[1]

The Plaintiffs in this suit describe themselves as the "victims" in an "illegal mortgage flipping scheme." (2nd Am. Compl. ¶ 1.) However, despite the Plaintiffs'

---

[1] This Entry is a matter of public record and will be made available on the court's web site. However, the discussion contained herein is not sufficiently novel to justify commercial publication.

determined efforts to play the victims here and characterize this scheme as a non-traditional mortgage flipping scheme, this is nothing more than a traditional mortgage flipping scheme in which the true victims are the lending companies. As the Second Amended Complaint alleges, the Plaintiffs were willing participants in this "get-rich-quick" scheme that involved defrauding the lending institutions. Only later, after realizing that they ended up with the short end of the stick, the Plaintiffs brought this action against their partners in the scheme, much like the case of the highwayman who sued his partner for an accounting of the profits of the robbery they had committed together. Unfortunately for the Plaintiffs, the courts will not entertain such actions.

This matter comes before the court on a motion by Defendants, Courtenay Stocker and NovaStar Home Mortgage, Inc. (collectively, "NovaStar"), to dismiss the Plaintiffs', Trent D. Decatur and Decatur Ventures, LLC, and Intervenor Plaintiffs', Triage Realty Investment, Inc., Jamie K. Goetz, Tonya S. (Blythe) Harvey, and Mona Orkoulas (collectively, "Plaintiffs"), Second Amended Complaint (the "Complaint") or to stay the proceedings pending joinder of necessary parties. After carefully reviewing the parties' briefs and supporting materials, the court finds as follows:

**I.      BACKGROUND**

The following factual background is based on the allegations made in and the attachments to the Complaint:

Essentially, the Plaintiffs claim that they were fraudulently induced into making investment purchases of residential real estate properties. The origins of this case can

be traced to May 2003, when Plaintiff Trent D. Decatur and Defendant Stapleton Ventures, Inc. ("SVI") entered into a joint business venture wherein SVI would seek out under-valued residential properties for purchase. SVI would then approach the owners of these properties and negotiate for their sale. Decatur, as buyer, would then enter into "Offer to Purchase Real Estate" agreements with each of the sellers. SVI would front the down payments for each of the purchases.

Over the course of four months, Decatur purchased a total of eight properties (hereinafter the "subject properties") under this basic arrangement. SVI planned to rehabilitate the subject properties, manage them, and find tenants willing to rent them. Decatur took out mortgage loans on the subject properties and was responsible for making all mortgage payments. To finance the monthly mortgage payments, Decatur would invoice SVI, and SVI would then reimburse him from the rent collected on the subject properties and pay him a percentage of the profits above the reimbursement figure, if any.

NovaStar, through its employee Courtenay Stocker, acted as mortgage broker for Decatur with respect to all of the subject properties. NovaStar's primary roles in this capacity were to order and obtain appraisals for each of the subject properties, assist Decatur in securing lenders for the mortgage loans, arrange for title work, and assist in the real estate closings. NovaStar's obligations to Decatur were set forth in two "Mortgage Loan Origination Agreements" dated June 6, 2003 and August 6, 2003.[2]

---

[2] These agreements contained identical terms.

Pursuant to those agreements, NovaStar arranged for appraisals on the subject properties for the purpose of helping Decatur obtain the necessary financing. The appraisals were obtained from Defendants Johnson, Phillips, and Daniel (collectively, the "Appraiser Defendants").[3] NovaStar allegedly "signed off" on the appraisals at the corresponding closings.

To more clearly illustrate this general pattern in purchasing properties under this scheme, the court will use Decatur's purchase of the 126 E. Pennsylvania Street, Shelbyville, IN property (the "126 E. Penn. property") as an example.[4] SVI apparently found the 126 E. Penn. property and represented to Decatur that the property was undervalued. Next, Michael Johnson, at the request of NovaStar, appraised the value of the property at $75,000.00. (2nd Am. Compl. Ex. J-2.) Accordingly, the parties listed the contract price of the sale at $74,000.00. Under SVI's direction and with NovaStar's help, Decatur applied for and obtained a mortgage loan for $66,600.00 (or 90% of the purported contract sales price) to purchase the property. (*Id.* Ex. J-1.) SVI temporarily loaned Decatur $8005.33 to pay the necessary 10% down payment and closing costs at closing. (*Id.* ¶¶ 25, 33.) The parties closed the sale on June 27, 2003. (*Id.* Ex. J-1.) The HUD Settlement Statement indicates that the sales price was $74,000.00, that

---

[3] Appraisers Miller and Stow were also originally listed as Defendants, but the court, with the Plaintiffs' consent, has since dismissed all claims against Miller and Stow in this cause of action.

[4] The 126 E. Penn. property purchase is illustrative of the general scheme in which the Plaintiffs and Defendants were engaged. However, nothing about the 126 E. Penn. property purchase makes it more or less significant than any other purchase alleged in the Second Amended Complaint.

Decatur provided the cash down payment of $8005.33, and that Decatur borrowed the remaining $66,600.00 in exchange for a mortgage on the property. (*Id.*)

However, a close inspection of the HUD Settlement Statement shows that it fails to accurately and truthfully depict the transaction. The reported sales price of $74,000.00 was a fiction. The seller sold the property for only $44,449.81 (including a 6% seller concession of $4,440.00 that was credited to the buyer). The remaining $29,550.19 went to SVI as a restoration/consultation fee (*id.*), but SVI never rendered any material services to the seller (*id.* ¶ 31). Instead, the restoration/consultation fee was a fiction necessary to make the seller's transaction match the buyer's transaction on the HUD Settlement Statement. (*Id.*) Decatur's down payment was likewise a fiction. Decatur acted only as a strawperson for SVI, who, for all intents and purposes, paid the down payment through Decatur. (*Id.* ¶¶ 25, 33.) After closing, SVI paid Decatur some portion of his profits (typically between $3,000.00 to $5,000.00) for the essential role Decatur played in the scheme and to entice Decatur to continue with the scheme. (*Id.* ¶¶ 3, 25, 37, 141.) A subsequent appraisal performed at the request of Decatur by an independent licensed real estate appraiser assessed the value of the 126 E. Penn. property as $35,000.00. (*Id.* Ex. J-3.)

In November of 2003, Decatur began to perceive problems with his investment when Stapleton stopped payment on a check for that month's mortgage reimbursement. Despite Decatur's inquires, Stapleton and SVI paid no further mortgage invoices. Stapleton eventually told Decatur that he was no longer in the property management business.

At the heart of this matter are allegations that the Defendants arranged for the subject properties to be appraised at amounts far greater than their true market values, and that SVI failed to maintain or improve the properties in accordance with the parties' agreement.  As a result, SVI allegedly failed to make any payments or reimbursements to Plaintiffs Decatur and Decatur Ventures, leaving them, much to their pecuniary harm, to satisfy the mortgage payments on all of the subject properties out of their own pockets.  Intervenor Plaintiffs Triage, Goetz, Harvey, and Orkoulas claim to have been victimized by the same basic scheme as that alleged in the Plaintiffs' Second Amended Complaint.  The Intervenor Plaintiffs make allegations against many of the same defendants named in Plaintiffs' complaint, but not all.  Specifically, the Intervenor Plaintiffs name as Defendants only SVI, Stapleton, NovaStar, Stocker, Phillips, and Daniel.

On March 21, 2005, the court granted in part and denied in part the Defendants' motion to dismiss the First Amended Complaint.  On September 2, 2005, the Plaintiffs filed their Second Amended Complaint, attempting to cure many of the defects existing in the First Amended Complaint.  Plaintiffs filed the Second Amended Complaint against Defendants SVI, Michael W. Stapleton, NovaStar, Courtenay Stocker, Lisa F. Phillips, Michael L. Johnson, and Kimberly Daniel.  The Second Amended Complaint sets forth thirteen counts as follows: I. violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), by NovaStar, SVI, Stapleton, Stocker, and Phillips; II. violation of RICO § 1962(a), by NovaStar, SVI, Stapleton, Stocker, and Phillips; III. conspiratorial violation of RICO § 1962(d), by NovaStar, SVI, Stapleton,

Stocker, and Phillips; IV. violations of Indiana's "baby RICO" statute, by NovaStar, SVI, Stapleton, Stocker, and Phillips; V. breach of contract, by SVI; VI. breach of contract, by NovaStar; VII. negligence, by SVI; VII. negligence per se, by Stapleton and/or SVI; IX. negligence, by NovaStar; X. negligence, by the Appraiser Defendants; XI. fraud, by NovaStar and Stocker; XII. fraud, by Stapleton and SVI; XIII. fraud, by Appraiser Defendants.

On October 14, 2005, Defendants NovaStar and Stocker (collectively, "NovaStar") filed a motion to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and (7). NovaStar argues *inter alia* that the Plaintiffs' claims are barred under the doctrine of *in pari delicto*. The motion seeks dismissal of only the counts against NovaStar: counts I., II., III., IV., VI., IX., and XI. In the alternative, NovaStar asks the court to stay the proceedings pending joinder of additional appraisers, whom NovaStar contends are necessary parties. The parties have briefed the motion and it is ripe for the court's review.

## II. DISCUSSION

### A. Standard of Review

The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. *See* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (3d ed. 2004). Dismissal is appropriate only if "'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Ledford v. Sullivan*, 105 F.3d 354, 356

(7th Cir. 1997) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). When considering such a motion, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *Cole v. U.S. Capital*, 389 F.3d 719, 724 (7th Cir. 2004); *Hentosh v. Herman M. Finch Univ. of Health Scis./The Chi. Med. Sch.*, 167 F.3d 1170, 1173 (7th Cir. 1999). Federal courts adhere to a notice pleading regime, and as such a plaintiff need not plead facts so long as the defendant has at least minimal notice of the claim or claims being asserted. Fed. R. Civ. P. 8; *Scott v. City of Chicago*, 195 F.3d 950, 951 (7th Cir. 1999). That being said, "the court is not required to ignore facts alleged in the complaint that undermine the plaintiff's claim." *Slaney v. The Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001). In addition, allegations of fraud (including those in a civil RICO action) are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b) that requires a plaintiff to plead all averments of fraud with particularity. *Id.*

**B.     *In Pari Delicto***

The doctrine of *in pari delicto* is an affirmative defense. Typically, affirmative defenses do not justify dismissal under Rule 12(b)(6) and "litigants need not try to plead around defenses." *Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003). However, in unusual cases in which the existence of a valid affirmative defense is "so plain from the face of the complaint," courts may dismiss under Rule 12(b)(6). *See Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002) ("[W]hen the existence of a valid affirmative defense is so plain from the face of the complaint that the suit can be regarded as frivolous, the district judge need not wait for an answer before dismissing

the suit."); 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004) ("The complaint also is subject to dismissal under Rule 12(b)(6) when its allegations indicate the existence of an affirmative defense, but the defense clearly must appear on the face of the pleading."); *see, e.g., Knauer v. Jonathon Roberts Fin. Group, Inc.*, 348 F.3d 230 (7th Cir. 2003) (affirming district court's dismissal under Rule 12(b)(6) because pleadings showed that suit was barred by doctrine of *in pari delicto*).  Thus, when a complaint alleges facts that clearly indicate the existence of the *in pari delicto* affirmative defense, the court may dismiss the claim pursuant to Rule 12(b)(6).

The doctrine of *in pari delicto* stands for the principle that "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." Black's Law Dictionary 794 (7th ed. 1999).  This common law defense "derives from the Latin, *in pari delicto potior est conditio defendentis*: 'In a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985).  The doctrine of *in pari delicto* is based on the policy that "courts should not lend their good offices to mediating disputes among wrongdoers" and "denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Id.*

The Plaintiffs argue that *in pari delicto* is an equitable doctrine that can only be applied in cases in which a plaintiff seeks equitable relief.  In this case, the Plaintiffs seek legal damages and contend that the equitable doctrine of *in pari delicto* is accordingly inapplicable.  The Plaintiffs are mistaken.  Federal Rule of Civil Procedure 2

allows a court to try legal, equitable, and admiralty issues in the same action, effectively "eliminat[ing] any procedural impediment to interposing all relevant defenses." 1-2 Moore's Federal Practice Civil § 2.05 at 31-32 (2003). In addition, Federal Rule of Civil Procedure 8(e)(2) specifically allows a party to assert as many defenses "as the party has regardless of . . . whether based on legal, equitable, or maritime grounds." Furthermore, the Seventh Circuit has recognized the doctrine of *in pari delicto* as appropriate where legal relief is sought. *Pieczynshki v. Duffy*, 875 F.2d 1331, 1333 (7th Cir. 1989) ("[T]here is a defense of . . . '*in pari delicto*' (if legal relief is sought)."); *Byron v. Clay*, 867 F.2d 1049, 1052 (7th Cir. 1989) ("Even before the merger [of law and equity] there was a counterpart *legal* doctrine to unclean hands—*in pari delicto*—which forbade a plaintiff to recover damages if his fault was equal to the defendant's.") (citing *Holman v. Johnson*, 1 Cowp. 341, 98 Eng. Rep. 1120 (K.B. 1775) (Mansfield, C.J.)); *see also Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 508 (1959) ("any defenses, equitable or legal" may be raised against charges of antitrust violations); *Maltz v. Sax*, 134 F.2d 2, 5 (7th Cir. 1943) ("As to unclean hands: the maxims of equity are available as defenses in actions at law."). Following the guidance from the Seventh Circuit, this court will allow the Defendants to raise the defense of *in pari delicto* in a case where the Plaintiffs seek legal damages.

Next, the Plaintiffs caution the court to apply the doctrine with reluctance and scrutiny, especially at the pleading stage of litigation, because it is an affirmative defense and "generally dependent on the facts, and so often not an appropriate basis for dismissal." *Knauer*, 348 F.3d at 237 n.6. The court is sensitive to the Plaintiffs'

concern; however, where, as here, the Plaintiffs have pled facts that conclusively show their fault for the claim or claims asserted, dismissal is proper. *See id.* (finding that dismissal was appropriate under the *in pari delicto* doctrine, "given the facts thoroughly alleged in the complaint"). Here, in an effort to plead with sufficient specificity (as required with RICO claims), the Plaintiffs have alleged facts that demonstrate their active and willing participation in a fraudulent scheme to obtain financing under false pretenses.

First, the Plaintiffs have alleged facts demonstrating that they willingly included false information on their loan applications in order to receive approval for their respective mortgage loans. The Complaint alleges that Stocker (and NovaStar) played an "integral part of the scheme," in part, by instructing "Decatur on the preparation of his mortgage loan applications. Specifically, Stocker determined the amount of 'monthly income' that Decatur was to report on his mortgage loan application(s) to ensure approval." (*Id.* ¶ 40.) This monthly income, which varies with each application, is clearly false, making these loan applications "fraudulent." (2nd Am. Compl. ¶ 31.)

Decatur's source of income came from his ownership interest in a non-real estate company, Pacintrex Industries, Inc. He was required to report his monthly income from Pacintrex as part of the mortgage loan application process. On May 28, 2003, Stocker instructed Decatur to write a handwritten note to the mortgage company indicating that he made $7759.00 per month from his company. (*Id.* Ex. D.) On June 9, 2003, Decatur complied with Stocker's request and wrote the note indicating he made $7759.00 per month from his company. (*Id.* Ex. G-1.) Less than a month later, on June 26, 2003,

Stocker instructed Decatur to write a new letter increasing his monthly income to $9932.00. (*Id.* Ex. F.) Again, Decatur complied on June 27, 2003, by writing the note to the mortgage company indicating that his monthly income from his company was $9932.00. Shortly thereafter, Decatur wrote a third note to a mortgage company, apparently at Stocker's request, indicating that he made $10,600.00 per month from his company. On September 25, 2003, Decatur signed a mortgage loan application, in connection with the 3220 W. 9th Street property, indicating that he made $12,000.00 per month from his company. (Reply Ex. 1.) Just one day later, Decatur signed another mortgage loan application, in connection with the 3324 W. 9th Street property, indicating that he made $15,000.00 per month from his company. (*Id.*) Instead of reporting his true income, Decatur apparently reported the amount of income necessary to qualify for each loan. That income amount started at $7759.00 per month on June 9, 2003, but conveniently had increased to $15,000.00 per month by September 26, 2003. (*Compare* 2nd Am. Compl. Ex. G-1 *with* Reply Ex. 1.) The Plaintiffs attached this evidence to the Complaint to allege that the Defendants were involved in a fraudulent scheme, involving "fraudulent loan applications." (2nd Am. Compl. ¶¶ 31, 40, 41, 43-45.) However, Decatur very much appears to be equally involved with this aspect of the fraud, writing new notes and adjusting his monthly income at Stocker's request.

While the court does not have access to the loan applications or reported income information as to the Intervening Plaintiffs, the Complaint alleges that "Stapleton . . . utilized a virtually identical scheme," in which Stocker instructed the Plaintiffs on the preparation of their mortgage loan applications. (*Id.* ¶¶ 115, 116, 142, 143.) In addition,

the Complaint admits that the loan applications of each Plaintiff were "fraudulent." (*Id.* ¶ 31.) From this, the court may reasonably infer that the loan applications of the Intervening Plaintiffs contained similar fraudulent information.

In addition to the false reported income, Decatur's mortgage loan applications contained false information regarding his respective down payments. The applications indicate that he did not borrow any portion of his down payment. (Reply Ex. 1.) This is clearly false, as the Complaint explicitly alleges that each Plaintiff, including Decatur, borrowed 100% of the down payment from Stapleton with every purchase. (2nd Am. Compl. ¶¶ 25(c), 33, 37, 141.) By falsely reporting that he made the down payments without borrowed funds, Decatur greatly increased the likelihood that the mortgage companies would accept his mortgage loan applications. Once again, Decatur is equally involved in the fraudulent loan application aspect of the scheme.

The Complaint further alleges that the Intervening Plaintiffs borrowed 100% of their down payments from Stapleton. Because the Defendants used "a virtually identical scheme" with the Intervening Plaintiffs, and because the Complaint admits that the loan applications were "fraudulent" (*id.* ¶ 31) and that the down payments were "improper" (*id.* ¶ 3), the court can reasonably infer that their mortgage loan applications contained similar false statements concerning the source of their down payment funds.

Furthermore, the HUD statements contain similar misleading information regarding the Plaintiffs' down payments for each property. The HUD statements indicate that the Plaintiffs' paid the 10% down payments on each property. However,

these down payments were nothing more than a fiction. Stapleton, not the Plaintiffs, provided the down payment money, and the Plaintiffs were never required to repay him. (*Id.* ¶¶ 25(c), 33, 37, 141.) Instead, Stapleton "recovered" the down payment amount from the proceeds of the sale. (*Id.* ¶¶ 37, 141.) Indeed, not only did the Plaintiffs fail to make down payments, but they further received cash payments from the proceeds of the sale, ranging from $3000 to $5000, for their involvement in the purchase. (*Id.*) Appropriately, the Complaint acknowledges that these "down payments" were "improper." (*Id.* ¶ 3.) The Plaintiffs were very aware that they were not actually making the down payments, and were instead walking away from the purchase with thousands of dollars in their pockets. Yet, they conveniently allowed the HUD statement to indicate otherwise.

The Plaintiffs' argument, that their behavior was not sufficiently egregious to justify the court's application of *in pari delicto*, is simply misplaced. They obtained financing under false pretenses and misrepresented the nature of their down payments. It is irrelevant that their behavior may have been "at the express direction of NovaStar and Stapleton." (Reply Br. 11.) As explained above, the allegations and attachments to the Complaint demonstrate their willingness to advance the fraud by making the misrepresentations. Their conduct was no less fraudulent than the conduct of Stapleton or Stocker, and was an equal and necessary part of the fraudulent scheme to obtain financing to purchase the properties. In their quest to get "something for nothing," the Plaintiffs willingly joined this venture and made several misrepresentations to advance the venture. In this manner, the Plaintiffs were partners in the scheme. It is only now,

-14-

after they willingly worked in conjunction with the Defendants to defraud the financing companies, that they complain that they too were victims of a fraud.  Unfortunately for the Plaintiffs, the doctrine of *in pari delicto* "is intended for situations in which the victim is a participant in the misconduct giving rise to his claim, as in the classic case of the highwayman who sued his partner for an accounting of the profits of the robbery they had committed together."  *Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 574 (7th Cir. 2004) (citations omitted).  Here, the Plaintiffs are no more victims than was the highwayman before them.  Instead, the true victims here are the financing companies who, in reliance on the false information allegedly provided to them by both the Plaintiffs and the Defendants, loaned the Plaintiffs the money to purchase the properties while receiving in return mortgages that were worth far less than the amount loaned.

Finally, the Plaintiffs aver that the court should not apply the doctrine of *in pari delicto* because they have purged themselves of any wrongdoing.  Because Decatur and Triage continue to pay the balances of their loans, they assert that "their lenders have suffered no ill-effects of the alleged inequitable conduct."  (Resp. Br. 11.)  The court first notes that Orkoulas has already defaulted on all three of her loans totaling $258,500 due to Argent Mortgage.  (2nd Am. Compl. ¶¶ 5, 148.)  As a result, Argent Mortgage is left with mortgages on properties that are allegedly worth a mere total of $114,000.  (Id. ¶¶ 154, 161, 168.)  With respect to Decatur and Triage, neither has yet defaulted on their loans; but this is not to say that "the lenders have suffered no ill-effects of the alleged inequitable conduct."  Decatur borrowed a total of $535,450 (*id.* ¶ 46), which amount is secured by mortgages on properties that are allegedly worth only

$244,000 (*id.* ¶¶ 52, 59, 67, 74, 81, 90, 99, 109). Triage borrowed a total of $223,950 (*id.* ¶ 118), which amount is secured by mortgages on properties that are allegedly worth only $90,000 (*id.* ¶¶ 124, 131, 138). In both cases, the lending companies are vastly undersecured as a result of the Plaintiffs' and Defendants' alleged misconduct. Of course, the fact that the lending companies are undersecured is, by itself, an "ill-effect" of the parties' misconduct. Accordingly, the Plaintiffs have not purged themselves of their wrongdoings.

The court refuses to entertain an action that, on its face, demonstrates the type of fraudulent misconduct on the part of a plaintiff as the Complaint alleges here. Consequently, the court concludes that the parties sit *in pari delicto*, and that the doctrine bars all claims by the Plaintiffs against Novastar and Stocker.

**C.   CONCLUSION**

For the foregoing reasons, the court finds that Stocker's and NovaStar's motion to dismiss should be **GRANTED** and all claims against Stocker and NovaStar should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) as barred by the doctrine of *in pari delicto*. It strikes the court that the principles in this ruling may extend to all remaining defendants named in this action, and, accordingly, the Plaintiffs must show cause why the court should not extend the doctrine of *in pari delicto* to bar all claims against the remaining defendants. In order to save briefing time and delay, the court will file a separate notice, contemporaneous with this entry, setting a date for oral argument on this matter. The court will reserve entering judgment under Rule 58(a)(1)

until after the above-mentioned oral argument has taken place.  Subsequent to the argument, the court will issue a judgment directing the clerk to dismiss the claims against NovaStar and Stocker, and, if appropriate, the remaining defendants.

    ALL OF WHICH IS ENTERED this 17th day of May 2006.

                                                       _____
                                                       John Daniel Tinder, Judge
                                                       United States District Court

Copies to:

Bruce E. Alexander
Weiner Brodsky Sidman Kider P.C.
alexander@wbsk.com

Lia R. Lukaart
Goodin Abernathy & Miller
llukaart@gamlawyers.com

Gregory H. Coleman
Clark Coleman & Freeman
ccfnattys@aol.com

Terry L. Monday
Monday Rodeheffer Jones & Albright
tmonday@aol.com

Neal Frederick Eggeson Jr.
Kopka Pinkus Dolin & Eads PC
nfeggeson@kopkalaw.com

Gary P. Price
Lewis & Kappes
gprice@lewis-kappes.com

Peter S. French
Lewis & Kappes
pfrench@lewis-kappes.com

Thomas Edward Rosta
Kopka Pinkus Dolin & Eads PC
terosta@kpdlawfirm.com

Steven Kenneth Huffer
Huffer & Weathers
steve_huffer@hufferandweathers.com

Cynthia G. Swann
Weiner Brodsky Sidman Kider PC
swann@wbsk.com

Hannah Kaufman
Lewis & Kappes
hkaufman@lewis-kappes.com

Robert D. Zink
Goodin Abernathy & Miller
rzink@gamlawyers.com

Mitchel H. Kider
Weiner Brodsky Sidman Kider PC
kider@wbsk.com

Magistrate Judge William T. Lawrence