UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DECATUR VENTURES, LLC, an Indiana Limited Liability Company; and TRENT D. DECATUR, an Individual, <br><br> Plaintiffs, <br><br> TRIAGE REALTY INVESTMENT, INC., an Indiana Corporation; JAMIE K. GOETZ, an Individual; TONYA S. (BLYTHE) HARVEY, an Individual; and MONA ORKOULAS, an Individual, <br><br> Intervenor Plaintiffs, <br><br> vs. <br><br> STAPLETON VENTURES, INC., an Indiana Corporation; NOVASTAR HOME MORTGAGE, INC., a Delaware Corporation; MICHAEL W. STAPLETON, an Individual; COURTENAY STOCKER, an Individual; MICHAEL L. JOHNSON, an Individual; and KIMBERLY DANIEL, an Individual, <br><br> Defendants. | 1:04-cv-0562-JDT-WTL |

**ENTRY ON DEFENDANT DANIEL'S
MOTION FOR SUMMARY JUDGMENT (Doc. No. 220)**[1]

This matter comes before the court on a motion by Defendant Kimberly Daniel

seeking summary judgment against the Plaintiffs, Trent D. Decatur and Decatur

Ventures, LLC, and Intervenor Plaintiffs, Triage Realty Investment, Inc., Jamie K. Goetz,

---

[1] This Entry is a matter of public record and will be made available on the court's web site. However, the discussion contained herein is not sufficiently novel to justify commercial publication.

Tonya S. (Blythe) Harvey, and Mona Orkoulas (collectively, "Plaintiffs").  After carefully reviewing the parties' briefs and supporting materials, the court finds as follows:

**I.     BACKGROUND**

    **A.     General Scheme**

Essentially, the Plaintiffs claim that they were fraudulently induced into making investment purchases of residential real estate properties.  The origins of this case can be traced to May 2003, when Plaintiff Trent D. Decatur and Defendant Stapleton Ventures, Inc. ("SVI") entered into a joint business venture wherein SVI would seek out under-valued residential properties for purchase.  SVI would then approach the owners of these properties and negotiate for their sale.  Decatur, as buyer, would then enter into "Offer to Purchase Real Estate" agreements with each of the sellers.  SVI would front the down payments for each of the purchases.

Over the course of four months, Decatur purchased a total of eight properties (hereinafter the "subject properties") under this basic arrangement.  SVI planned to rehabilitate the subject properties, manage them, and find tenants willing to rent them.  Decatur took out mortgage loans on the subject properties and was responsible for making all mortgage payments.  To finance the monthly mortgage payments, Decatur would invoice SVI, and SVI would then reimburse him from the rent collected on the subject properties and pay him a percentage of the profits above the reimbursement figure, if any.

NovaStar, through its employee Courtenay Stocker, acted as mortgage broker for Decatur with respect to all of the subject properties. NovaStar's primary roles in this capacity were to order and obtain appraisals for each of the subject properties, assist Decatur in securing lenders for the mortgage loans, arrange for title work, and assist in the real estate closings. NovaStar arranged for appraisals on the subject properties for the purpose of helping Decatur obtain the necessary financing. NovaStar obtained appraisals from Defendants Johnson, Miller, Stow, Phillips, and Daniel (collectively, the "Appraiser Defendants").[2] NovaStar allegedly "signed off" on the appraisals at the corresponding closings.

In November of 2003, Decatur began to perceive problems with his investment when Stapleton stopped payment on a check for that month's mortgage reimbursement. Despite Decatur's inquiries, Stapleton and SVI paid no further mortgage invoices. Stapleton eventually told Decatur that he was no longer in the property management business.

At the heart of this matter are allegations that the Defendants arranged for the subject properties to be appraised at amounts far greater than their true market values, and that SVI failed to maintain or improve the properties in accordance with the parties' agreement. As a result, SVI allegedly failed to make any payments or reimbursements to Plaintiffs Decatur and Decatur Ventures, leaving them, much to their pecuniary harm, to satisfy the mortgage payments on all of the subject properties out of their own

---

[2] Appraisers Miller, Stow, and Phillips were originally listed as Defendants, but the court, with the Plaintiffs' consent, has since dismissed all claims against these three appraisers.

pockets. Intervenor Plaintiffs Triage, Goetz, Harvey, and Orkoulas claim to have been victimized by the same basic scheme.

**B.     Kimberly Daniel's Involvement**

In June 2002, Lisa Phillips received her real estate appraiser "trainee license." (Phillips Dep. 5:10-14.) Indiana law prohibits licensed trainee appraisers from working independently or holding themselves out to the general public as a licensed or certified appraiser. 876 Ind. Admin. Code 3-6-9(i). Instead, licensed trainee appraisers must be supervised by a supervising licensed appraiser. *Id.* 3-6-9(b). The supervising appraiser is responsible for the direct supervision of the trainee appraiser and must sign and certify the trainee's appraisal reports in compliance with the Uniform Standards of Professional Appraisal Practice. *Id.* 3-6-9(c).

Upon becoming a trainee appraiser, Phillips contacted Kimberly Daniel and asked Daniel to be her supervising appraiser. Kimberly Daniel, who became an independently licensed real estate appraiser in 2001 (Daniel Dep. 7:11-16), agreed to supervise Phillips for a flat fee of fifty dollars per supervised appraisal.

Subsequently, Mr. Stapleton contacted Phillips and ordered the appraisals on nine properties by submitting the signed purchase agreements to Phillips. Four appraisals were for four properties purchased by Decatur.[3] (2nd Am. Compl. Exs. L-2,

---

[3] The Decatur appraisals were for the following properties: 229 N. Holmes Ave; 3232 W. 9th St.; 3220 W. 9th St.; and 3324 W. 9th St.

M-4, N-2, O-3.)  Two appraisals were for two properties purchased by Goetz.[4]  (*Id.* Exs. Q-2, R-2.)  Three appraisals were for three properties purchased by Orkoulas.[5]  (*Id.* Exs. W-2, X-2, Y-2.)  Phillips completed the appraisals and forwarded them to Daniel for her supervisory approval.  Daniel performed her own physical (on-site) inspections for three of the properties (1249 Ringgold Ave.; 2922 N. Delaware St.; and 3746 Capitol Ave.), and signed the remaining six appraisal reports in a supervisory capacity without completing a physical inspection.[6]  After electronically signing each appraisal report, Daniel returned the reports, in electronic format, to Phillips.  Phillips then turned over the completed and signed reports to Novastar, who is the "lender/client" as indicated in each appraisal report.

Phillips indicates that, on occasion, she altered the appraisal reports after receiving signed copies back from Daniel but before forwarding on the reports to NovaStar.  She altered the reports by first removing Daniel's electronic signature, making the changes, then pasting Daniel's signature back on the report.  Phillips explains that she never altered the appraised values.  (Phillips Dep. 11:23-24.)  Instead, she admits to altering appraisals marked by Daniel as "did not inspect" to a "did inspect" status knowing that it was a requirement for loan approval.  (*Id.* 11:25-12:7.)  Phillips

---

[4]  The Goetz appraisals were for the following properties: 1249 Ringgold Ave. and 444 N. Gray St.  The 444 N. Gray St. appraisal, dated April 9, 2003, does not contain Phillip's or Daniel's signature.

[5]  The Orkoulas appraisals were for the following properties: 2922 N. Delaware St.; 974 Edgemont St.; and 3746 Capitol Ave.

[6]  The Indiana administrative code does not require the supervising appraiser to perform a separate physical inspection once the trainee appraiser demonstrates "competency."  876 Ind. Admin. Code 3-6-9(i).

took these "shortcuts" due to the time pressure and deadlines that Stocker and NovaStar placed upon her. (*Id.* 12:16-13:2; 28:11-14.) Daniel never knew about these alterations. (*Id.* 45:6-8; Daniel Dep. 36:3-10.)

## II.     STANDARD OF REVIEW

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light most reasonably favorable to the nonmoving party. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Baron v. City of Highland Park*, 195 F.3d 333, 337-38 (7th Cir. 1999). However, once a properly supported motion for summary judgment is made, the non-movant "cannot rest on the pleadings alone, but must identify specific facts to establish that there is a genuine triable issue." *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994); *see* Fed. R. Civ. P. 56(e).

## III.    DISCUSSION

The Plaintiffs assert two claims against Ms. Daniel: negligence and fraud. Daniel seeks summary judgment on both claims.

### A. Negligence

Under Indiana law, "in order to prevail on a claim of negligence the plaintiff must show: (1) duty owed to plaintiff by defendant; (2) breach of duty by allowing conduct to fall below the applicable standard of care; and (3) compensable injury proximately caused by defendant's breach of duty." *King v. N.E. Sec., Inc.*, 790 N.E.2d 474, 484 (Ind. 2003). "Duty is a question of law for the court to decide. Absent a duty, there can be no breach of duty and thus no negligence or liability based upon a breach." *Peters v. Forster*, 804 N.E.2d 736, 738 (Ind. 2004).

In this case, the Plaintiffs assert that Daniel owed a duty to the Plaintiffs to perform the appraisal work on the subject properties in a professional and workmanlike manner. (2nd Am. Compl. ¶¶ 229-30.) In response, Daniel argues that, under Indiana case law, her role as an appraiser did not create a duty to the Plaintiffs, who were the purchasers of the property.

As Daniel points out, *Emmons v. Brown*, 600 N.E.2d 133 (Ind. Ct. App. 1992), provides helpful guidance as to whether an appraiser owes a duty to the purchaser/borrower of a property. In *Emmons*, the purchasers of a home brought a negligence suit against the appraiser, claiming that the appraiser negligently conducted an appraisal of the house, thereby inducing them to purchase it. The appraiser's obligation to perform the appraisal stemmed from his employment relationship with the Federal Housing Administration (FHA) as an appraiser. The purchasers acknowledged the absence of a contractual relationship between themselves and the appraiser, yet

they asserted that the appraiser owed them a duty because they were third party beneficiaries to the appraiser's employment contract with FHA. In that case, the appraisal report identified the purchasers as the "owner/occupant" of the house and indicated that the report may be used by the borrower. Despite these provisions, the court refused to recognize a duty owed to the purchaser, holding that "[i]n Indiana, a professional owes no duty to one with whom he has no contractual relationship unless the professional has actual knowledge that such third person will rely on his professional opinion." *Emmons*, 600 N.E.2d at 135; *see also Block v. Lake Mortgage Co.*, 601 N.E.2d 449, 452 (Ind. Ct. App. 1993) (holding on the reliance issue that "Indiana requires actual knowledge on the part of the appraiser").

Following *Emmons*, the court must determine here whether Daniel had actual knowledge that the Plaintiffs would rely on her appraisal opinions. Like in *Emmons*, the appraisal reports list the Plaintiffs as the "borrowers," but list NovaStar as the "lender/client." Although the Plaintiffs assert that they relied on the appraisals,[7] they have produced no evidence that Daniel (or even Phillips) had actual knowledge that the Plaintiffs would rely on the appraisals. Without evidence of actual knowledge on the part of Daniel, the Plaintiffs cannot prove that Daniel owed a duty to them, and therefore

---

[7] Even this allegation is unsupported by the evidence. The Plaintiffs assert in affidavits that, prior to closing, they either received a copy of the appraisal or Stapleton informed them of the appraisal result. However, this evidence, without more, is insufficient to demonstrate reliance on the appraisals. In fact, as in *Emmons*, the record here indicates that the Plaintiffs had not even seen the appraisals (indeed, the appraisals had not been completed) when they entered into purchase agreements to purchase the properties.

cannot prove negligence. The court accordingly will **GRANT** Daniel's motion for summary judgment on the negligence claim.

### B. Fraud

Under Count XIII of the Second Amended Complaint, the Plaintiffs claim that Daniel committed fraud by submitting false and fraudulent appraisal reports. The elements of fraud under Indiana law are: "(1) a material misrepresentation of past or existing facts; (2) made with knowledge or reckless ignorance of falsity; (3) causing the claimant to rely upon the misrepresentation to the claimant's detriment." *Tobin v. Ruman*, 819 N.E.2d 78, 86 (Ind. Ct. App. 2004) (citation omitted). The issue here is whether the appraisal reports are mere opinions, as Daniel argues, or whether they can constitute statements of fact.

Under Indiana law, appraisals are expressions of opinion, not statements of fact, and thus are not generally actionable under a fraud theory. *See Kreighbaum v. First Nat'l Bank & Trust*, 776 N.E.2d 413, 421 (Ind. Ct. App. 2002); *Block v. Lake Mortgage Co.*, 601 N.E.2d 449, 451 (Ind. Ct. App. 1993); *see also Wheatcraft v. Wheatcraft*, 825 N.E.2d 23, at 30-31 (Ind. Ct. App. 2005) ("The general rule is that statements of value are regarded as mere expressions of opinion."). The Plaintiffs acknowledge the general rule in Indiana, but nevertheless attempt to distinguish this case from the general rule. Although not entirely clear, the Plaintiffs apparently attempt to attack the appraisals under two different theories: 1) that the facts providing the foundation of the appraisal

opinions are false; or 2) that the appraisals do not actually represent Daniel's genuine opinion.

First, the Plaintiffs argue that when an appraiser supports the appraisal with underlying facts that are intentionally false, then the general rule should not apply. Following this theory, the Plaintiffs attack the factual foundation of the appraisers. For example, the Plaintiffs allege that Phillips and Daniel used comparable homes and sales to form the foundation of their appraisal values, but that those comparable homes/sales were not actually comparable because they were located in superior neighborhoods or included superior features. However, as Daniel indicates, Indiana courts have rejected similar attempts to sidestep the general rule holding appraisals as opinions. *See Block*, 601 N.E.2d at 451. In *Block*, the plaintiff attempted to avoid the general rule by defining the appraisal as "a compilation of facts gleaned by comparing the subject house to houses sold in the area," and arguing that those facts were false. *Id.* The court rejected the argument, explaining that "an appraisal of property is not the result of a scientific analysis, but is, rather, a subjective opinion which can and does differ from the next appraisal even though both may be based on current real estate market trends." *Id.* Following *Block*, this court must reject the Plaintiffs attempt to define the appraisal as a compilation of false facts underlying the actual opinion.

Nonetheless, *Block* does not preclude the Plaintiff's second theory: that the appraisals do not actually represent Daniel's genuine opinion. In the Second Amended Complaint, the Plaintiffs suggest that Stapleton, NovaStar, and Stocker predetermined the purchase prices of the properties to be as much as double the market value. (2nd

Am. Compl. ¶ 27.)  Then, knowing that a genuine appraisal would not justify the purchase prices, Stocker sought and selected appraisers who were willing to appraise the properties at values that meet the predetermined purchase prices regardless of the appraisers' genuine opinion of the value.  (*Id.* ¶¶ 27, 236.)  In other words, the Plaintiffs allege that the product that the Defendants purport to be the appraisal does not actually qualify as an appraisal because it does not represent the genuine opinion of the appraiser.  If the Plaintiffs can prove that Daniel intentionally misrepresented the value of the property in order to meet a predetermined price, and that the predetermined price clearly falls below where her genuine opinion would arrive, then *Block* would not preclude a fraud action based on the Phillips/Daniel appraisal reports.

Here, the summary judgment record does not support such a finding.  The Plaintiffs point to two pieces of evidence in an attempt to demonstrate an issue of fact on this point.  First, the Plaintiffs provide appraisal values from their retained appraiser, David Woods, whose appraisal values are far less than those supplied by Phillips and Daniel.  (*See* Woods 2nd Aff., Doc. No. 245-15.)  The Plaintiffs compare the values between the Phillips/Daniel appraisals and the Woods appraisals, and from the discrepancy in the appraised values, the Plaintiffs ask the court to make an inference that Daniel's appraisal values were not genuine.  However, comparing appraisal reports from different appraisers is exactly the type of evidence that *Block* precludes.  *Block*, 601 N.E.2d at 451 ("[O]ne need only examine eminent domain cases to realize that different appraisers can value properties at different amounts.").  Under *Block*, the court

cannot draw inferences of fraudulent conduct merely from evidence showing differing appraisal values from different appraisers.

> Second, the Plaintiffs provide the affidavit of Plaintiff Mona Orkoulas, who stated:
>
> On May 18, 2004, I talked to Ms. Phillips. She told me that the appraisal reports that she submitted to Novastar in respect to the houses that I purchased listed inflated values for the houses. She told me that Mr. Stapleton provided copies of purchase agreements for my houses and told her to increase the value of her initial appraisals. Ms. Phillips told me she received money to appraise the houses for more than the houses were worth.

(Orkoulas Aff. ¶¶ 23-24, Doc. No. 245-14.)[8] To the extent that the Plaintiffs have made a showing suggesting that Phillips acted intentionally in providing an appraisal value that did not represent her genuine opinion, they still have yet to show how Phillips's intentional lack of genuineness is relevant to Daniel's opinion. Even if Phillips's value did not represent her true opinion, that fact alone does not lead to the conclusion that Daniel acted intentionally to provide a value that did not represent her true opinion. Moreover, the Plaintiffs fail to produce any evidence suggesting that Daniel provided a value that was not genuine, let alone evidence suggesting that she did so intentionally.[9]

---

[8] The court notes that Orkoulas's statement contradicts Phillip's deposition statements. When asked at deposition whether Stapleton pressured her to "come up with any particular number on any appraisal," Phillips replied, "[N]o—I mean, I never was told, 'If you don't hit this number, I'm not using you,' no." (Phillips Dep. 43:21-44:2.) She further answered that "Stapleton never did anything like pay [her] to come up with a specific number for an appraisal." (*Id.* 44:3-5.)

[9] Unlike with Phillips, the record shows that Stapleton had never met or contacted Daniel and did not even know that Daniel was involved with the appraisals. (Stapleton Dep. 8:13-15, 44:23-24.)

To side-step this hurdle, the Plaintiffs appear to argue that Phillips's alleged fraudulent and intentional misconduct should be imputed to Daniel under principles of agency law. The court disagrees. Although Phillips retained Daniel to serve as her supervising appraiser pursuant to 876 Indiana Administrative Code 3-6-9, the trainee-supervisor relationship was not an agent-principal relationship. "An agent is one who acts on behalf of some person, with that person's consent and subject to that person's control." *Oil Supply Co. v. Hires Parts Serv., Inc.*, 726 N.E.2d 246, 248 (Ind. 2000). In this case, Phillips did not act on behalf of Daniel and certainly Phillips was not subject to Daniel's control. Daniel's only duty as a supervising appraiser was, in essence, to ensure the accuracy of the appraisal report. She completed this duty by either conducting her own on-site inspection, or by reviewing Phillips's report and certifying it with her signature. She did not control the manner in which Phillips conducted her appraisals; instead, she provided her own review to insure that Phillips's appraisal amount, in Daniel's opinion, was accurate.

If anything, the relationship appears more akin to that of an independent contractor in which Phillips hired Daniel to perform the task of supervising appraiser. At that time, Daniel was an independent appraiser and Phillips worked for an appraisal company not associated with Daniel. They had separate businesses in which they recruited separate clients. Phillips paid Daniel a flat fee of fifty dollars for each appraisal Daniel supervised in this manner. Most importantly, Daniel neither had nor exercised the type of control over Phillips that is necessary to establish an agency relationship. As such, the court cannot impute any knowledge or misconduct to Daniel.

-13-

In short, the record lacks any evidence suggesting that Daniel provided nothing less than her genuine opinion on the appraisal reports. To the extent the same cannot be said concerning Phillips, Phillips's purported misconduct cannot be imputed to Daniel. Accordingly, the court must treat Daniel's appraisal as a genuine opinion, which cannot form the basis of the fraud claim. The court therefore will **GRANT** Daniel's motion for summary judgment on the Plaintiff's fraud claim.

**IV.   CONCLUSION**

For the foregoing reasons, the court **GRANTS** Daniel's motion for summary judgment (Doc. No. 220) and will **DISMISS** the Plaintiffs' count X (negligence) and count XIII (fraud) to the extent that they seek relief against Daniel. Because this entry disposes of all claims against Daniel, the court, pursuant to Federal Rule of Civil Procedure 54(b), finds no just reason to delay entry of judgment on these claims. The court directs the Clerk to enter judgment in favor of the Defendant Daniel on counts X and XIII.

ALL OF WHICH IS ENTERED this 11th day of August 2006.

_____
John Daniel Tinder, Judge
United States District Court

Copies to:

Bruce E. Alexander
Weiner Brodsky Sidman Kider P.C.
alexander@wbsk.com

Gregory H. Coleman
Clark Coleman & Freeman
ccfnattys@aol.com

Neal Frederick Eggeson Jr.
Kopka Pinkus Dolin & Eads PC
nfeggeson@kopkalaw.com

Peter S. French
Lewis & Kappes
pfrench@lewis-kappes.com

Steven Kenneth Huffer
Huffer & Weathers
steve_huffer@hufferandweathers.com

Hannah Kaufman
Lewis & Kappes
hkaufman@lewis-kappes.com

Mitchel H. Kider
Weiner Brodsky Sidman Kider PC
kider@wbsk.com

Lia R. Lukaart
Goodin Abernathy & Miller
llukaart@gamlawyers.com

Terry L. Monday
Monday Rodeheffer Jones & Albright
tmonday@aol.com

Gary P. Price
Lewis & Kappes
gprice@lewis-kappes.com

Thomas Edward Rosta
Kopka Pinkus Dolin & Eads PC
terosta@kpdlawfirm.com

Cynthia G. Swann
Weiner Brodsky Sidman Kider PC
swann@wbsk.com

Robert D. Zink
Goodin Abernathy & Miller
rzink@gamlawyers.com

Magistrate Judge William T. Lawrence